UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ODIS JONES *et al.*,

        Plaintiffs,                  Case No. 16-cv-12647
                                             Hon. Matthew F. Leitman

v.

SCRIPPS MEDIA, INC.

        Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S RENEWED MOTION TO DISMISS (ECF #24)

Between April 28, 2016, and May 9, 2016, Detroit television station WXYZ[1] broadcast three investigative reports about the Detroit Public Lighting Authority (the "PLA"). The reports asserted that several PLA employees, including the PLA's former Chief Executive Officer Odis Jones ("Jones"), received lucrative severance payments that were hidden from the public. In this action, Jones claims that the reports defamed him and cost his business (co-Plaintiff MVP Capital Ventures, LLC ("MVP")) a multi-million dollar housing contract with Wayne State University. (*See* First Am. Compl., ECF #20.) WXYZ has now filed a motion to dismiss. (*See* ECF

---

[1] WXYZ is owned by Defendant Scripps Media, Inc., a Delaware corporation. (*See* First Am. Compl. at ¶3, ECF #20 at Pg. ID 252.) For ease of reference, the Court will refer to the Defendant throughout this Opinion and Order as "WXYZ."

#24.)  For the reasons set forth below, WXYZ's motion is **GRANTED IN PART AND DENIED IN PART**.

## I[2]

### A

In 2013, the City of Detroit formed the PLA in order to "improve, modernize, and maintain the City's street light infrastructure." (First Am. Compl. at ¶¶ 9-10, ECF #20 at Pg. ID 253.)  Shortly after its formation, the PLA hired Jones as its first Chief Executive Officer. (*See id.* at ¶¶ 13-15, ECF #20 at Pg. ID 254.)  Among other things, Jones "led the City of Detroit's efforts" to install over 60,000 street lights throughout the City. (*Id.* at ¶¶ 17-18, ECF #20 at Pg. ID 254.)

"During his tenure with the [] PLA, [] Jones became aware of some opportunities for his private sector businesses." (*Id.* at ¶27, ECF #20 at Pg. ID 257.) Jones says that before he pursued any of these outside business opportunities, he sought and received clearance from "the Detroit PLA Board of Directors, [the] General Counsel and Ethics Officer for the City of Detroit PLA, the City of Detroit Inspector General[,]" and others. (*Id.* at ¶29, ECF #20 at Pg. ID 257.)  Despite these approvals, at least two PLA employees, Sandra Hughes O'Brien ("O'Brien") and Dana Harvey ("Harvey") objected to Jones' outside business activities. (*See id.* at

---

[2] The facts set forth in this section are drawn from the First Amended Complaint and taken as true, as they must be in the context of the pending motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

¶30, ECF #20 at Pg. ID 257.)  They thereafter became "openly hostile to [] Jones." (*Id.* at ¶31, ECF #20 at Pg. ID 258.)

In September 2015, the PLA fired both O'Brien and Harvey. (*See* First Am. Compl. at ¶32, ECF #20 at Pg. ID 258.)  After their firing, O'Brien and Harvey prepared draft whistleblower lawsuits in which they alleged that the PLA fired them because they had "knowledge that [] Jones was conducting illegal activities" at the PLA and were about to "expose" his behavior. (ECF #20-1 at 14, Pg. ID 308; *see also* First Am. Compl. at ¶¶ 33-34, ECF #20 at Pg. ID 258.) Among other things, O'Brien and Harvey alleged that Jones had "engineered" a severance payment to the PLA's former Chief Operating Officer Adam Troy ("Troy") "as payment for a business debt owned by Jones to Troy."[3] (First Am. Compl. at ¶35, ECF #20 at Pg. ID 258.)

O'Brien and Harvey sent drafts of their lawsuits to the PLA, and the PLA's general counsel Tiffany Sadek ("Sadek") began investigating their claims.  Sadek ultimately concluded in a written report (the "Sadek Report") that neither the PLA Board of Directors (the "PLA Board") nor Jones committed "any wrongdoing or ethical violations." (*Id.* at ¶¶ 41-42, ECF #20 at Pg. ID 259; *see also* the Sadek Report at ECF #20-1.)  The PLA then settled its dispute with Harvey and O'Brien. (*See id.* at ¶44, ECF #20 at Pg. ID 260.)  As part of their settlement, "[b]oth O'Brien

---

[3] The payment to Troy is described more fully below.

and Harvey received severance payments from the Detroit PLA.  They also each signed severance agreements and releases in which they [] pledged to keep the details of their settlement and dispute confidential." (*Id.* at ¶46, ECF #20 at Pg. ID 260.) The First Amended Complaint does not allege that the PLA ever publicly discussed or disclosed Harvey's and O'Brien's termination, the settlement of their potential legal action, or the terms and conditions of their severance packages.

## B

At around this same time, Troy also resigned. (*See* ECF #20-1 at 12, Pg. ID 306.)  In connection with his resignation, Troy entered in a severance agreement with the PLA (the "Troy Severance Agreement").[4] (*See id.* at 66, Pg. ID 360.)  Under the Troy Severance Agreement, the PLA agreed to pay Troy $58,000 in severance pay, including "accrued vacation, personal, and sick time for which he was entitled to receive as compensation." (ECF *id.* at 13, Pg. ID 307; *see also id.* at 66, Pg. ID 360.)

Jones signed the Troy Severance Agreement on behalf of the PLA. (*See id.* at 66, Pg. ID 360.)  Jones alleges that the PLA Board was "aware of" the "precise terms" of the Troy Severance Agreement before he signed it and that the board "agreed" with those terms. (First Am. Compl. at ¶¶ 38, 106, ECF #20 at Pg. ID 259,

---

[4] This appears to be the same severance agreement that O'Brien and Harvey referenced in their draft legal complaints.

4

276.)   But Jones does not allege that he ever presented the Troy Severance Agreement to the PLA Board for formal approval, that the agreement was ever on an agenda at a board meeting, that the board ever publicly discussed Troy's separation from the PLA or disclosed the terms of the agreement, or that the board ever took a formal vote on the agreement.

After Troy left the PLA, he worked as Jones' "business partner" in co-Plaintiff MVP.[5] (*See*, *e.g.*, *id.* at ¶131(I), ECF #20 at Pg. ID 285.)

### C

Jones decided to leave the PLA in February 2016. (*See id.* at ¶48, ECF #20 at Pg. ID 260.)  Jones and the PLA then negotiated an agreement to end his employment (the "Jones Separation Agreement"). (*See id.* at ¶49, ECF #20 at Pg. ID 261.)   As part of the Jones Separation Agreement, the PLA agreed to make a "severance" payment to Jones. (*Id.*)  Jones maintains "he was entitled to receive [such a payment] upon termination of his Detroit PLA employment under his amended employment agreement." (*Id.*)  The Jones Separation Agreement also required Jones and the PLA Board to keep the "terms and conditions" of the agreement confidential. (*Id.* at ¶54, ECF 20 at Pg. ID 262.)

---

[5] It is not yet clear to the Court when Troy began working for MVP and/or became Jones' "business partner."

After Jones and the PLA completed their negotiations of the Jones Separation Agreement, "[t]he Detroit PLA sent out an advance public meeting notice and conducted a Public Meeting in accordance with the Michigan Open Meetings Act concerning the departure of [] Jones as the Detroit PLA CEO." (*Id.* at ¶52, ECF #20 at Pg. ID 261.) Jones has not alleged that the meeting notice contained any details about the terms of the Jones Separation Agreement nor that it identified the amount of his severance payment.  A PLA press release that announced Jones' resignation likewise did not include any details about the terms of his separation.  (*See* ECF #8-7.)

On February 3, 2016, the PLA Board held the meeting that it had earlier announced in the public notice. (*See* First Am. Compl. at ¶52, ECF #20 at Pg. ID 261; *see also* Meeting Minutes, ECF #8-8.)  The minutes of that meeting indicate that the PLA Board discussed the terms of Jones' separation from the PLA during a "closed session" that was not open to the public. (*See* Meeting Minutes, ECF #8-8.) After the PLA Board concluded its "closed" session, it returned to open session and "approve[d]" both Jones' resignation and the terms of the Jones Separation Agreement. (*Id.*)  Jones has not alleged, and the public minutes of the PLA Board meeting do not reflect, that the board publicly discussed or disclosed either the terms of the Jones Separation Agreement or the specific amount of Jones' severance. (*See id.*)

**D**

In March 2016, soon after Jones left the PLA, WXYZ investigative reporter Ronnie Dahl ("Dahl") began working on a series of television reports about severance payments the PLA made to its former employees, including Jones, O'Brien, Harvey, and Troy.[6] (*See* First Am. Compl. at ¶62, ECF #20 at Pg. ID 264.) As part of her investigation, Dahl spoke with Jones and filed a Freedom of Information Act request seeking records related to severance payments the PLA had made. (*See id.* at ¶55, ECF #20 at Pg. ID 262.)  The PLA produced 46 pages of documents to Dahl, including certain press releases, the public notice of Jones' departure from the PLA, Jones' employment agreement, and "various other documents evidencing the departure of a variety of Detroit PLA employees from their employment with that entity." (*Id.* at ¶57, ECF #20 at Pg. ID 262-63.)  The PLA also produced the Jones Separation Agreement to Dahl. (*See id.* at ¶58, ECF #20 at Pg. ID 263.)  After Dahl received those documents, she "confronted [] Jones at a Detroit bar.  In hostile tones, she angrily accused [] Jones of 'lying to her', got 'in his face' and wagged her finger at him while making these accusations." (*Id.* at ¶64, ECF #20 at Pg. ID 264.)

---

[6] Dahl also investigated a severance payment made to Katrina Crawley ("Crawley"), who was the PLA's Vice President of Construction and Engineering.  As with the payments to Troy, O'Brien, and Harvey, there are no allegations in the First Amended Complaint that the PLA ever publicly discussed or disclosed the payment to Crawley or the terms and conditions of her separation from the PLA.

**E**

WXYZ aired Dahl's reports on April 28, 2016, April 29, 2016, and May 9, 2016. (*See id.* at ¶64, ECF #20 at Pg. ID 264.) WXYZ also published the reports on its website. (*See id.* at ¶65, ECF #20 at Pg. ID 264.) The reports raised serious questions about Jones' tenure as PLA CEO and the PLA's use of public funds to pay severance packages. The reports repeatedly referred to these payments, both in on-screen graphics and spoken words, as "secret severances." (*See id.* at ¶¶ 62, 74, ECF #20 at Pg. ID 264, 266.) The Court summarizes the three reports below.[7]

**1**

The initial report aired on April 28, 2016. Dahl first introduced the PLA and extolled its work for the City of Detroit. She called the PLA one of City's "brightest" stars and credited the organization with "replacing street lights at a blistering pace." Dahl then explained that the PLA financed its operations through a sale of public

---

[7] "Because the allegations [in the First Amended Complaint] … are based upon and reference" the three televised reports, and because the three reports are central to the claims in the First Amended Complaint, "this Court may consider them on [WXYZ's] Rule 12(b)(6) motion to dismiss without converting that motion into one for summary judgment." *Hazime v. Fox TV Stations, Inc.*, 2013 WL 4483485, at *1 (E.D. Mich. Aug. 19, 2013) (considering video of televised news reports in ruling on motion under Rule 12(b)(6)); s*ee also DMC Plumbing & Remodeling, LLC v. Fox News Network, LLC*, 2012 WL 5906870, at *3 (E.D. Mich. Nov. 26, 2012) (ruling in a defamation case that, because "the Complaint refers to the April 1, 2011 news broadcast, and the broadcast is central to Plaintiffs' claims for defamation," the DVD of that broadcast would be considered by the Court in ruling on the defendant's motion to dismiss). The Court's summary of the reports is derived from the Court's review of the DVD containing the three reports. (*See* ECF #15).

bonds, and she said that the bonds are to be paid back with funds that were originally earmarked for police and safety.  The report then showed Detroit Mayor Mike Duggan ("Mayor Duggan") describing the PLA as "a huge public trust."  Duggan explained that the PLA was using "public safety money" and therefore had an obligation to "make sure [its funds were] being used to the maximum benefit."

Dahl then began to question whether the PLA was, in fact, using its funds "to the maximum benefit."  She informed viewers that WXYZ investigators had "uncovered documents" that raised "disturbing questions" about the PLA's use of public funds.  Specifically, Dahl said that "the PLA dished out more than a half million dollars of severance payments" to five former employees – Jones, Troy, O'Brien, Harvey, and Crawley – "who got the cash on one condition: go away, don't sue, and never talk."  Dahl later specified how much each employee received in severance and told viewers that when WXYZ contacted some of the employees for comment, the employees told the station that "confidentiality agreements prevented them from talking."

Dahl then introduced "noted labor lawyer" Deborah Gordon ("Gordon"). Dahl said that Gordon had "reviewed Jones' contract and everything about his departure" from the PLA.  Gordon then appeared on camera and said that "[t]he statements being made publicly are very clear that he [Jones] has resigned.  Under his [employment] agreement, if [he] resigned, he doesn't get any severance pay."

9

Dahl then said that Jones nonetheless "incredibly" did get a severance payment – a "goodbye present" of a "quarter-million tax-payer dollars and health care for a year." Dahl also said that Jones and the PLA Board agreed to keep the Jones Separation Agreement a "secret." Later in the report, Dahl told the audience that Jones and Troy are now "business partners," and MVP's logo was shown on screen at that time.

The report concluded with Dahl interviewing PLA Board President Dr. Lorna Thomas ("Dr. Thomas"). Dahl asked Dr. Thomas about the severance payments to Jones and the other employees, where the money came from, and whether the severance payments were an appropriate use of public funds. Dr. Thomas generally refused to comment. She said only that the payments and severance agreements were "personnel matter[s]."

**2**

The second report aired on April 29, 2016. Early in the report, Dahl reminded viewers that Jones received a $250,000 payment "after resigning to pursue new opportunities." At this same moment, the report displayed an image of MVP's logo. Dahl also identified the severance payments that O'Brien, Troy, Harvey, and Crawley received.

Dahl told viewers that Dr. Thomas refused to discuss why the payments were made, and the report showed Dr. Thomas refusing to answer Dahl's questions on this issue. Shortly thereafter, 1:20 into the report, Dahl said that "noted employment

10

lawyer Deb Gordon, who reviewed the documents for [WXYZ], has a theory" about the payments.  Gordon appeared on camera and said that the departing employees received the payments in "exchange for giving up [their] rights to file a lawsuit" and for "remain[ing] quiet."

Dahl then provided support for Gordon's "theory."  She explained that before O'Brien and Harvey left the PLA, they "threatened [to bring] whistleblower lawsuits" in which they would have claimed that "they witnessed illegal activities at the PLA."  The report did not identify those "illegal activities."  Dahl then asked Dr. Thomas on camera whether O'Brien and Harvey were "paid to keep their mouths shut," and Dr. Thomas again responded that this was a "personnel matter" on which she would not comment.

The report then cut back to Gordon and depicted her as saying "he [Jones] violated the law, and other people got caught in the crossfire, bring those people back, get rid of him, turn it over to the AG, and don't waste any taxpayer money."[8]  This depiction appears almost exactly one minute after the earlier reference to Gordon having a "theory."

Following Gordon's statement, Dahl said that "more mystery" surrounded the $58,000 severance payment that Troy received "after less than a year on the job."

---

[8] WXYZ insists that the report depicts Gordon as qualifying this statement with the word "if."  As described below, the Court concludes that Jones has plausibly alleged that the word "if" is not audible.

11

Dahl remarked that the payment was "signed by [Troy's] boss, Odis Jones" and that "months later, the two became partners in a company called MVP Capital."  The MVP logo was again shown on the screen at that point.  Dahl then said that "curiously, the company was registered with the state one day before Jones signed Troy's severance deal."  The report concludes with Mayor Duggan saying that he believed based on WXYZ's reporting that "there was a lot else going on" at the PLA.

### 3

The third and final report aired on May 9, 2016.  It was a "follow-up" to the reports that aired in late April.  Dahl informed viewers that "there's been plenty of outrage since we broke the story of how the Public Lighting Authority handed out more than $500,000 to five top execs to buy their silence."  And the report included interviews with various politicians criticizing the payments.

The report further indicated that Dahl attempted to find public records of the severance payments.  It explained that Dahl reviewed all of the available minutes from PLA Board meetings and found only one reference to the resignation of Jones and nothing with respect to Troy, Crawley, O'Brien, or Harvey.

Dahl also told viewers that the PLA had undertaken a "secret investigation … into its executives as it was paying them to stay quiet."  That investigation was the one described in the Sadek Report.  Dahl said that Sadek's investigation was triggered by allegations that Jones "use[d] authority resources to get business for his

side company, MVP.  [Sadek] also investigated Adam Troy … Jones' now partner at MVP."  After Dahl asked rhetorically "how did Troy get his gig at PLA," the report displayed a graphic of falling $100 bills and the figure "$58,000" in large red letters, and Dahl asked: "why did Jones give [Troy] $58,000 severance after less than a year on the job?"

Dahl did acknowledge Sadek's conclusion that "Jones and Troy did nothing wrong."[9]  But Dahl then questioned Sadek's impartiality and noted that "Troy and MVP [had] been [Sadek's] client when she was in private practice" and that they were "paying her" before she joined the PLA.  Dahl concluded the final report by informing viewers that lawmakers were looking into how they could stop similar severance payments in the future.

**F**

In the First Amended Complaint, Jones specifically identifies four classes of statements from the televised reports that he alleges defamed him:

- **"He Broke the Law."**  First, Jones says that the manner in which WXYZ used the footage of its interview with Gordon during the April 29, 2016, broadcast defamed him.  The report depicted Gordon as saying that "he violated the law" and that the case should be "turn[ed] [] over to the AG [Attorney General]." (*See* First Am. Compl. at ¶¶ 66-78, ECF #20 at Pg. ID

---

[9] WXYZ also posted the Sadek Report in full on its website.

265-68.)[10] Jones contends that Gordon never actually said that he violated the law, but instead suggested only that *"if"* he had violated the law, then there should be consequences for those actions. (*See id.* at ¶69, ECF #20 at Pg. ID 265.) Jones insists that Dahl and WXYZ "obscure[ed]" the word "if' and "deceptive[ly] edit[ed]" Gordon's statement "to give the impression … that [it was] a flat declaration … without any context or clarification." (*Id.* at ¶¶ 66, 72, ECF #20 at Pg. ID 265-66.) Jones says that the "editing" was "undertaken with the malicious intent to create the false impression[]" that he was a "lawbreaker." (*Id.* at ¶75, ECF #20 at Pg. ID 267.)

- **"Secret Severances."** Next, Jones says that the reports falsely portrayed him as participating in a "shadowy and illegal scheme" to keep "secret" the severance payments he and other PLA employees received. (*Id.* at ¶¶ 83-89, ECF #20 at Pg. ID 269-72.) Jones contends that the severances were not "secret" and that he was not involved in any effort to hide anything from the public.

- **"Buying Silence."** Third, Jones alleges that the reports made "repeated slanderous assertions that [he] is a corrupt man who can be bought." (*Id.* at ¶90, ECF #20 at Pg. ID 272.) Specifically, Jones complains that the reports implied that the PLA "purchased" his "silence" and "secrecy" through his severance payment. (*Id.* at ¶¶ 91, 99, ECF #20 at Pg. ID 272-73, 275.) Jones insists that his silence was not "purchased" and that his severance had nothing to do with remaining "quiet."

---

[10] Jones has plausibly alleged that the "he" Gordon referred to was Jones himself. (*See* First Am. Compl. at ¶68, ECF #20 at Pg. ID 265.) Moreover, WXYZ has not contended that the "he" was someone else.

14

- **"Jones Paying Off Troy."**  Finally, Jones says that the following question from the May 9 2016, report was defamatory:  "Why did Jones give him [Troy] $58,000 severance after less than a year on the job?" (*Id.* at ¶100, ECF #20 at Pg. ID 275.)  Jones says that WXYZ knew that (1) the PLA Board was aware of and agreed with the terms of the Troy Severance Agreement and (2) the PLA made the $58,000 payment to Troy. (*See id.* at ¶¶ 105-106, ECF #20 at Pg. ID 276.)  Jones maintains that the question was phrased "in [an] inflammatory fashion to create the false implication that Jones [was] by himself secretly using PLA funds to pay off his business partner." (*Id.* at ¶102, ECF #20 at Pg. ID 276-77.)

MVP also says that it was defamed by the reports.  It contends that the reports repeatedly showed images of its logo and website while Dahl spoke about alleged wrongdoing by Jones and/or Troy. (*See*, *e.g.*, *id.* at ¶67, ECF #20 at Pg. ID 265.) MVP insists that this editing "falsely associate[d]" it with the "incendiary statement[s]" that Dahl made about Jones and Troy and falsely implied that MVP "is run by persons who have violated the law." (*Id.* at ¶¶ 67, 76, ECF #20 at Pg. ID 265, 267.)

Jones and MVP (collectively, "Plaintiffs") further maintain that Dahl and WXYZ timed the reports to cause "maximum damage" to their business prospects. (*Id.* at ¶111, ECF #20 at Pg. ID 278.)  Specifically, Plaintiffs say that Dahl and WXYZ were "aware" that MVP "was one of three finalists under consideration to receive a multi-million dollar housing contract from Wayne State University the

very week of the broadcasts.  It was [therefore] critical that [WXYZ] get the broadcasts out to impart the maximum damage to [MVP's] prospect for that bid." (*Id.* at ¶¶ 111-112, ECF #20 at Pg. ID 278.)  According to Plaintiffs, "within a day or two of [WXYZ's] initial report" Wayne State told Jones and MVP that "they would not be awarded the contract due to the controversy ginned up by [WXYZ's] false reports." (*Id.* at ¶ 113, ECF #20 at Pg. ID 278.)

## G

Plaintiffs initially filed this action against WXYZ on July 15, 2016. (*See* Compl., ECF #1.)  WXYZ moved to dismiss the Complaint on September 1, 2016 (the "First Dismissal Motion"). (*See* ECF #8.)  The Court held a hearing on the First Dismissal Motion on December 5, 2016. (*See* Dkt.)  During the hearing, counsel for Plaintiffs told the Court that if Plaintiffs were granted leave to amend the Complaint, they would be able to plead additional facts with respect to their defamation claim. Following a telephonic status conference on December 14, 2016, the Court entered an Order in which it (1) terminated the First Dismissal Motion without prejudice, (2) permitted Plaintiffs to file a First Amended Complaint, and (3) allowed WXYZ to renew the First Dismissal Motion after Plaintiffs filed the First Amended Complaint. (*See* ECF #19.)

Plaintiffs filed the First Amended Complaint on December 23, 2016. (*See* First Am. Compl., ECF #20.)  The First Amended Complaint contains four counts against WXYZ, each brought under Michigan law:

- Defamation (both Plaintiffs) (*see id.* at ¶¶ 120-135, ECF #20 at Pg. ID 281-87);

- Interference with Advantageous Business Relations (both Plaintiffs) (*see id.* at ¶¶ 136-142, ECF #20 at Pg. ID 287-88);

- False Light Publicity Invasion of Privacy (both Plaintiffs) (*see id.* at ¶¶ 143-148, ECF #20 at Pg. ID 288-89); and

- Intentional Infliction of Emotional Distress (Jones only) (*see id.* at ¶¶ 149-154, ECF #20 at Pg. ID 289-90.)

WXYZ renewed the First Dismissal Motion on January 10, 2017 (the "Renewed Motion to Dismiss"). (*See* ECF #24.)  In the Renewed Motion to Dismiss, WXYZ seeks dismissal of all four counts of the First Amended Complaint. (*See id.*)

## II

WXYZ has moved to dismiss Plaintiffs' claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  "To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v.* Twombly, 550 U.S. 544, 555 (2007)).  A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct. *See id*.

17

When assessing the sufficiency of a plaintiff's claim, a district court must accept all of a complaint's factual allegations as true. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001). "Mere conclusions," however, "are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664. A plaintiff must therefore provide "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 556. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## III

## A

Under Michigan law, a plaintiff must plead the following elements to state a claim for defamation:

> 1) a false and defamatory statement concerning the plaintiff, 2) an unprivileged communication to a third party, 3) fault amounting to at least negligence on the part of the publisher, and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication.

*Nichols v. Moore*, 477 F.3d 396, 399 (6th Cir. 2007) (quoting *Rouch v. Enquirer & News*, 487 N.W.2d 205, 211 (Mich. 1992)). A statement "is defamatory under Michigan law 'if it tends so to harm the reputation of another as to lower him in the estimation of the community or deter third persons from associating or dealing with

18

him.'" *Falls v. Sporting News Pub. Co.*, 834 F.2d 611, 615 (6th Cir. 1987) (quoting

*Nuyen v. Slater*, 127 N.W.2d 369, 374 (Mich. 1964)).   Michigan law imposes

liability only for statements that are *materially* false. *See Rouch*, 487 N.W.2d at 208,

214-15.  The test for materiality "look[s] to the sting of the [statement] to determine

its effect on the reader; if the literal truth produced the same effect, minor differences

[are] deemed immaterial." *Id*. at 214-15.

        In addition to satisfying the common-law requirements of defamation under

Michigan law, a plaintiff "must also satisfy the constitutional requirements of the

First Amendment." *Nichols*, 477 F.3d at 399.   Under the First Amendment, "a

statement on matters of public concern must be provable as false before there can be

liability under state defamation law." *Milkovich v. Lorain Journal Co*., 497 U.S. 1,

19 (1990).  Moreover, "if the plaintiff is a public figure, he must show by clear and

convincing evidence that the defamatory statements were made with 'actual malice,'

that is, that [the statements were] made 'with knowledge that [they were] false or

with reckless disregard of whether [they were] false or not.'" *Nichols,* 477 F.3d at

399 (quoting *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964)).

## B

        Before analyzing the allegedly defamatory statements at issue here, the Court

must determine whether Jones is a public figure and thus whether he must satisfy the

First Amendment's "actual malice" standard. "Whether a plaintiff is a private or

public figure is a question of law." *Armstrong v. Shirvell*, 596 Fed. App'x 433, 444 (6th Cir. 2015).

Jones insists that he "is not a public figure or public official" because "[h]e did not hold his position as a public official when the reports were published, had only limited access to the press due to the confidentiality and non-disparagement clauses in [the Jones Separation Agreement], and did not have the authority to make the decisions or undertake the actions relating to the defamatory statements published by [WXYZ]." (First Am. Compl. at ¶128, ECF #20 at Pg. ID 282.) WXYZ counters that the actual malice requirement "applies to comments made about the conduct of public officials even after they have *left* office" and that Jones thus qualifies as a public official for purposes of this action. (First Dismissal Motion at 16, ECF #8 at Pg. ID 92; emphasis in original).

The Court agrees with WXYZ. WXYZ's televised reports focused on Jones' conduct while he was CEO of the PLA and aired in reasonably close temporal proximity to the time Jones ended his employment with the PLA. The fact that Jones was not a public official at the precise moment the reports aired does not insulate Jones from having to plead actual malice. *See Revell v. Hoffman*, 309 F.3d 1228, 1232 (10th Cir. 2002) ("That the person defamed no longer holds the same position does not by itself strip him of his status as a public official for constitutional

20

purposes.").[11] Indeed, in *Rosenblatt v. Baer*, 383 U.S. 75, 84-87 (1966), the Supreme Court held that a plaintiff who left government employment six months before the publication of an allegedly-defamatory newspaper article *could* qualify as "public official" and could be required to plead and prove actual malice.[12]

In sum, even though Jones had left his high-ranking public office by the time the reports aired, for purposes of this action he is a "public official," and he must plausibly allege both that WXYZ defamed him under Michigan law *and* that WXYZ acted with actual malice. Requiring Jones to plead and prove actual malice here is especially appropriate in light of the fact that WXYZ's reports addressed matters of substantial public interest. "Speech on matters of public concern … is at the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451 (2011) (quotation and citation omitted).

---

[11] *See also Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1069-70 (5th Cir. 1987) (holding that law enforcement officials who had left their positions six years prior to newspaper report about their in-office activities were still public officials for purposes of libel action); *Pierce v. Capital Cities Communications, Inc.*, 576 F.2d 495, 510 n.67 (3d Cir. 1978) ("The passage of some three years between the time of [plaintiff's] departure from the Port Authority and the airing of the broadcast did not, by itself, strip [plaintiff] of his status as a 'public official' for purposes of analyzing this case"); *Martz v. Bower*, 2012 WL 11919376, at *4 (Mich. Ct. App. Nov. 27, 2012) ("[T]he fact that [plaintiff] was no longer the building and zoning administrator at the time defendant made her statements does not affect his status as a public official for purposes of analyzing defendant's statements, which concerned [plaintiff's] involvement with the township board").

[12] The Supreme Court remanded the case back to the state courts for a determination of whether the nature of the plaintiff's employment satisfied the "public official" test.

## IV

In the Renewed Motion to Dismiss, WXYZ argues that (1) the statements made in the three televised reports were not materially false and defamatory and (2) Plaintiffs have not sufficiently pleaded that WXYZ acted with actual malice. The Court focuses its analysis below on these issues as it evaluates the four allegedly-defamatory classes of statements from WXYZ's reports. The Court will first analyze the Renewed Motion to Dismiss with respect to Jones' claims. It will then separately address MVP's claims.

## A

WXYZ's statements that the severances were "secret" and part of "secret" deals were not materially false, and thus Jones' defamation claim based on those statements fails as a matter of law. The word "secret" generally means "kept from knowledge or view." *Webster's Third New International Dictionary*, Unabridged (2017). Here, the terms and conditions of *all* of the severance agreements that were the subject of WXYZ's reports were "kept from knowledge or view" of the public. Indeed, Jones has not alleged that the PLA Board held any public meetings concerning, or publicly released the terms and conditions of, the severance agreements for Troy, O'Brien, Harvey, and Crawley. And while the PLA Board approved the Jones Separation Agreement at a public meeting, the board discussed that agreement in a *closed* session and did not disclose the terms and conditions of

his severance (including the amount).  Moreover, the severance agreements for Jones, O'Brien, Harvey, and Crawley all contained confidentiality provisions that prohibited the parties from disclosing their terms to the public.  For all of these reasons, WXYZ's use of the term "secret" to describe the severances was not materially false and cannot form the basis of a claim for defamation under Michigan law.

## B

Jones' claim that he was defamed by WXYZ's statements that his silence and "secrecy" were "purchased" likewise fails because those statements were not materially false.  As part of the Jones Separation Agreement, the PLA paid Jones a sum of money.  In exchange, Jones agreed, among other things, to keep the terms and conditions of the Jones Separation Agreement confidential.  While Jones objects to the characterization that his silence was "bought," and while WXYZ's description of the Jones Separation Agreement used colorful, attention-grabbing language, that language is not materially inaccurate or false.[13]  In fact, Jones acknowledged in his response to the First Dismissal Motion that confidentiality provisions, like the one in the Jones Separation Agreement, "provide" an important benefit that "parties …

---

[13] As noted above, the Court does not believe that WXYZ's description of the Jones Separation Agreement as buying Jones' silence was false.  But even if the description could be deemed somewhat inaccurate, at worst it is the kind of "rhetorical hyperbole" that cannot form the basis of a defamation claim. *Milkovich*, 497 U.S. at 17.

will pay value for." (Jones Resp. Br. at 16, ECF #13 at Pg. ID 175.)  Jones may not

proceed with a defamation claim based on WXYZ's characterization that his

"secrecy" was "purchased."

## C

Jones has not stated a viable defamation claim with respect to the question in

the May 9, 2016, report: "Why did Jones give him [Troy] $58,000 severance after

less than a year on the job?" (First Am. Compl. at ¶100, ECF #20 at Pg. ID 275.)

Jones plausibly alleges that there is a factual assertion embedded in this question:

namely, that Jones alone caused the PLA to "give" Troy the $58,000 severance.[14]

But Jones has not plausibly alleged that that assertion is materially false.  And even

if that assertion could be deemed materially false, Jones' defamation claim based

---

[14] WXYZ argues that a question may never form the basis of a defamation claim
because a question is not capable of being proven true or false.  However, the
Michigan Supreme Court has suggested that at least some questions may be
defamatory.  *See Smith v. Anonymous Joint Enterprise*, 793 N.W.2d 533, 549 (Mich.
2010) (instructing courts to analyze allegedly defamatory statements "in their proper
context," to avoid "elevat[ing] form over substance," and not to "rely[] merely on
the use of a question mark as punctuation" when determining whether a statement
"is capable of a defamatory meaning").  Other courts have held that a question may
be defamatory. *See*, *e.g.*, *Obsidian Finance Group, LLC v. Cox*, 812 F.Supp.2d 1220,
1225 (D. Ore. 2011) (recognizing that if a question "can be reasonably read as an
assertion of false fact, it may be actionable" in a defamation claim); *Point Ruston,
LLC v. Pacific Northwest Regional Council of the United Brotherhood of Carpenters
and Joiners of America*, 2010 WL 3732984, at *8 (W.D. Wash. Sept. 13, 2010)
("[U]sing a '?' at the end of a statement does not automatically insulate [the
defendant] from liability for defamation").  The Court assumes without deciding that
the embedded factual assertion in the question at issue here may form the basis of a
defamation claim.

upon it would still fail because he has not plausibly alleged that WXYZ made the assertion with actual malice.

## 1

Jones has not sufficiently alleged that the assertion that he alone caused the PLA to "give" Troy $58,000 in severance is materially false.  Jones signed the Troy Severance Agreement, and it was that agreement that "gave" the $58,000 to Troy.  Critically, Jones has not alleged that any other person or entity actually made the decision to enter into the Troy Severance Agreement and to pay the severance to Troy.  Of particular importance, he has not alleged that he sought PLA Board approval before signing the Troy Severance Agreement or that the board ever formally approved the agreement in advance.  Instead, he alleges only that the PLA Board was "aware of and agreed with the Troy severance package." (*Id.* at ¶¶ 38, 106, ECF #20 at Pg. ID 259, 276.)  But the PLA Board's awareness of, and informal agreement with, the Troy Severance Agreement is a far cry from the board actually making the decision to enter into that agreement and/or to pay the $58,000 to Troy.  Simply put, the facts alleged by Jones do not show any material falsity in WXYZ's assertion that Jones alone caused the PLA to pay $58,000 in severance to Troy, and Jones' defamation claim based on that assertion therefore fails as a matter of law.

**2**

Even if WXYZ's assertion that Jones alone caused the PLA to "give" Troy $58,000 was materially false, Jones' defamation claim based upon that assertion would still fail because he has not plausibly alleged that WXYZ made the assertion with actual malice. At the time WXYZ asked the question containing that assertion, it had a copy of the Troy Severance Agreement. Jones alone signed that agreement on behalf of the PLA, and his signature suggests (even though it may not conclusively prove) that he was the one approving the payment to Troy and causing the PLA to make the payment. Moreover, nothing in the Troy Severance Agreement itself indicates that it was presented to the PLA Board for formal approval before it was signed or that the board provided such approval. In fact, WXYZ explained in the report that Dahl reviewed all of the available meeting minutes from PLA Board meetings and found no records reflecting that the PLA Board ever considered, much less approved or took any formal action related to, the Troy Severance Agreement or the payment to Troy. And Jones has not alleged that the PLA Board's minutes reflect such action.

Jones insists that the Sadek Report – which WXYZ possessed at the time it aired the report – shows that WXYZ's assertion that Jones alone caused the PLA to pay Troy $58,000 was false. The Court disagrees. The Sadek Report does not unambiguously indicate that any person or entity other than Jones caused the PLA

26

to make the payment.  Instead, as Jones highlights in the First Amended Complaint, the Sadek Report says that the PLA Board "was aware of and agreed with the Troy severance package." (First Am. Compl. at ¶106, ECF #20 at Pg. ID 276) (citing the Sadek Report).)  But, as noted above, the PLA Board's knowledge of and informal agreement with the payment to Troy is not the same as the board formally approving the payment or making the decision to pay Troy.  Moreover, WXYZ reasonably noted in its report that in light of the prior relationship between Sadek and Jones, there was a valid reason to question the objectivity of the Sadek Report and its findings and conclusion.

In sum, Jones has not alleged any specific facts showing that WXYZ knew, or recklessly disregarded, the falsity of the assertion that Jones alone caused the PLA to make the severance payment to Troy.  Thus, Jones has failed to sufficiently allege that WXYZ made the assertion with actual malice,[15] and Jones' defamation claim based on that assertion accordingly fails as a matter of law.

---

[15] Jones includes a laundry list of allegations in his First Amended Complaint to support his contention that WXYZ acted with actual malice. (*See* First Am. Compl. at ¶131, ECF #20 at Pg. ID 283-86.)  But the bulk of these allegations say little, if anything, about whether WXYZ knew, or recklessly disregarded, the falsity of the *specific* assertion that Jones alone caused the PLA to make the severance payment to Troy.  Stated another way, Jones has not shown how any of the facts highlighted in these allegations placed WXYZ on notice that its assertion that Jones alone caused the PLA to pay Troy's severance was false.

**D**

Jones may proceed with his defamation claim based on his allegation that WXYZ falsely depicted Gordon as saying "he [Jones] violated the law, and other people got caught in the crossfire, bring those people back, get rid of him, turn it over to the AG, and don't waste any taxpayer money."

**1**

Jones has plausibly alleged that WXYZ's depiction of Gordon's statement was "materially false" under Michigan defamation law. According to Jones, Gordon did *not* say that he violated the law or should be referred to the Attorney General; instead, she carefully avoided drawing that conclusion and made only the hypothetical statement that Jones should be referred for prosecution "*if*" he broke the law. Jones plausibly contends that WXYZ's alleged editing of the Gordon interview conveys a far different message to the viewers than what she actually said. Indeed, there is a substantial difference between telling viewers that an employment law expert suggested that Jones should be considered for prosecution "if" he broke the law and telling viewers that such an expert has actually determined that Jones broke the law and should be prosecuted. Thus, Jones has sufficiently alleged material falsity. *Cf. Rouch*, 487 N.W.2d at 214-15 (explaining that a statement is not materially false where the literal truth would have the "same effect" on a listener).

28

Jones has also plausibly alleged that WXYZ's false depiction of Gordon's statement is "defamatory" under Michigan law.  A statement by an esteemed employment lawyer like Gordon that Jones violated the law and should be referred to the Attorney General could tend to "harm [his] reputation … as to lower him in the estimation of the community or deter third persons from associating or dealing with him.'" *Falls*, 834 F.2d at 615 (quoting *Nuyen*, 127 N.W.2d at 374).  Thus, the depiction of Gordon's statement is actionable under Michigan law.

WXYZ counters that it did not obscure Gordon's use of the word "if," that the word was audible, and that the report accurately reflected Gordon's statement.  But the Court has listened to Gordon's statement in the report numerous times and concludes that Jones' characterization of the statement – as lacking an audible "if" – is a plausible one.

WXYZ next insists that even if the word "if" is obscured, the report still did not communicate that Gordon, in fact, concluded that Jones had violated the law. WXYZ contends instead that the report merely presented Gordon as offering her "theory" based on her review of the evidence.  In support of this argument, WXYZ highlights its statement in the report that Gordon "has a theory." (*See* First Dismissal Mot. at 9, ECF #8 at Pg. ID 85.)  However, Jones has plausibly alleged that the April 29 report does not present Gordon's "he violated the law" statement as part of her "theory."  The reference to Gordon's "theory" and Gordon's statement that Jones

29

"violated the law" are separated by nearly a full minute of other material. Given that separation, Jones plausibly alleges that a viewer would not regard Gordon's "violated the law" statement as part of her earlier-referenced "theory."

Moreover, even if WXYZ presented only Gordon's "theory," Jones would have a viable defamation claim for WXYZ's alleged misrepresentation of that theory. Jones has plausibly alleged that (1) Gordon did *not* theorize that he violated the law but (2) WXYZ nonetheless presented her as offering that theory. This alleged mischaracterization of Gordon's "theory" satisfies the materially falsity element of Jones' defamation claim because there is a significant difference between representing to viewers that a pre-eminent employment lawyer like Gordon actually believes (i.e., "has a theory") that Jones broke the law and indicating to viewers that she was merely discussing what should happen "if" he did so. And, as noted above, the allegedly-false depiction of Gordon's theory is defamatory because it could harm Jones' reputation in the community and dissuade others from associating with him. Thus, even if WXYZ presented Gordon's statement as her "theory," Jones has stated a viable defamation claim under Michigan law with respect to that statement.

Finally, WXYZ says that Gordon's statement cannot be deemed actionable when considered "in the entire context of the broadcast," as it must be under Michigan law. (Renewed Mot. to Dismiss, ECF #24 at 8, Pg. ID 440.) To WXYZ, "[t]he obvious import of the broadcast is not 'here's what happened: someone broke

30

the law' but, to the contrary, 'we don't know what happened and we can't find out.'"
(*Id.*)   The Court agrees that certain portions of the broadcasts did focus on unanswered questions.   But Jones has plausibly alleged that the Gordon statement, as supposedly distorted by WXYZ, purported to answer the very question posed by the stories: did someone break the law?   Simply put, Jones has sufficiently alleged that even if much of the reports concerned unanswered questions, a reasonable viewer could nonetheless regard the purportedly-distorted Gordon statement as a definitive claim that Jones did, indeed, break the law.

**2**

Jones has also plausibly alleged that WXYZ acted with "actual malice" with respect to its depiction of Gordon's statement.   Jones has alleged that WXYZ knew that Gordon did not say or theorize that he broke the law but that WXYZ nonetheless presented her as saying or theorizing just that.   In other words, Jones has alleged that WXYZ acted with knowledge that its depiction of Gordon's statement was false. That is a sufficient allegation of "actual malice."   *See Sullivan*, 376 U.S. at 280 ("actual malice" requires "knowledge of falsity").   In fact, the Supreme Court has held that the *Sullivan* "actual malice" standard is satisfied where a speaker knowingly misquotes another in a manner that "results in a material change in the meaning conveyed by the [original speaker's] statement."   *Masson v. New Yorker*

31

*Magazine*, *Inc.*, 501 U.S. 496, 517 (1991).  That is what Jones plausibly alleges here

with respect to WXYZ's alleged false depiction of Gordon's statement.

WXYZ counters that Jones has not plausibly alleged that WXYZ knowingly

and/or intentionally distorted Gordon's statement:

> Plaintiffs argue that it is difficult to hear Deborah Gordon utter the word
> 'if' and that this is so because Defendant intentionally *made it* difficult.
> But Plaintiffs have alleged absolutely no facts in support of this
> conclusion.  Indeed, it is at least equally plausible that the word is
> difficult to hear (assuming, for the sake of argument, that it is) because
> Gordon did not say the word as loudly or as clearly as Plaintiffs would
> like.  As *Twombly* makes clear, when there is a plausible and benign
> alternative explanation for the conduct that a plaintiff challenges, then
> that plaintiff has not made out a plausible case in his pleadings.

(Renewed Mot. to Dismiss, ECF #24 at 7, Pg. ID 439; emphasis in original.)   The

Court disagrees.

Under the facts alleged by Jones (which include the reports themselves), it is

not equally plausible that the word "if" is difficult to hear because Gordon did not

speak with sufficient volume or clarity.  The reports contain several statements by

Gordon.  During each statement, she speaks clearly and maintains her voice at an

audible volume.  Gordon's demonstrated and consistent speech pattern reasonably

supports the inference that she did not suddenly drop her voice or muffle her words

when saying "if."  Accordingly, Jones has shown "more than a sheer possibility"

that the word "if" is not missing due to Gordon's manner of speaking and has thus

satisfied his requirements under *Twombly*. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556-57 and describing the *Twombly* standard.)

Moreover, Jones has alleged that Dahl had personal animus toward him and a motive to do him harm (*see*, *e.g.*, First Am. Compl. at ¶¶ 131(H), 131(I), 131(L), ECF #20 at Pg. ID 285-86), and these allegations lend further support to Jones' claim that the distortion of Gordon's statement resulted from a knowing and intentional act by WXYZ rather than some other cause. As the Sixth Circuit has explained, ill-will and a motive to injure may be "circumstantial evidence, which, when combined with other evidence, may amount to malice." *Perk v. Reader's Digest Ass'n*, 931 F.2d 408, 411 (6th Cir. 1991).[16] Here, Dahl's alleged dislike of Jones provides a motive for WXYZ to injure his reputation, and that purported motive adds plausibility to Jones' assertion that WXYZ intentionally distorted Gordon's statement. Jones has cleared *Sullivan's* actual malice hurdle with respect to the depiction of Gordon's statement.

## E

In Count II of the First Amended Complaint, Jones alleges that WXYZ tortiously interfered with his business relationships. WXYZ seeks dismissal of that

---

[16] *See also Young v. Gannett Satellite Information Network, Inc.*, 734 F.3d 544, 548 n.1 (6th Cir. 2013) (same); *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 315 n.10 (5th Cir. 1995) ("Although we recognize that proof of ill will or animosity is not required to show actual malice, evidence of ulterior motive can often bolster an inference of actual malice") (internal citation and emphasis removed).

claim on one ground: that it fails because "it [is] based on the same speech as the failed defamation claim." (First Dismissal Mot. at 22, ECF #8 at Pg. ID 98.)  The Court agrees that Jones may not pursue a tortious interference claim based upon statements from the broadcasts that are insufficient to support a defamation claim (i.e., the statements that Jones was involved with "secret severances," that his silence and secrecy was "purchased," and that he "gave" Troy $58,000). *See*, *e.g.*, *Hazime*, 2013 WL 4483485, at *14 ("It is well-established in Michigan law that once a defamation claim fails, all related tortious interference claims fall with it") (citing *Lakeshore Cmty. Hosp., Inc. v. Perry*, 538 N.W.2d 24, 27 (Mich. App. 1995)).  But the Court has concluded that Jones *has* stated a viable defamation claim with respect to WXYZ's depiction of Gordon's statement.  WXYZ offers no argument as to why the Court should dismiss a tortious interference claim that rests upon a statement that is sufficient to support a defamation claim.  Therefore, the Court will therefore permit Jones to proceed with his tortious interference claim with respect the Gordon statement.

## F

Jones brings a claim for "False Light Publicity Invasion of Privacy" in Count III of the First Amended Complaint.  WXYZ has moved to dismiss the false light claim on only one ground: that it fails because Jones' defamation claim fails. (*See* First Dismissal Mot. at 23, ECF #8 at Pg. ID 99.)  The Court agrees that Jones cannot

pursue a false light claim with respect to the three classes of statements that failed to support a cognizable defamation claim (i.e., the statements that Jones was involved with "secret severances," that his silence and secrecy was "purchased," and that he "gave" Troy $58,000). These statements cannot form the basis of a false light claim because, as explained above, they are not materially false. *See*, *e.g.*, *Dupuis v. City of Hamtramck*, 502 F.Supp.2d 654, 659 (E.D. Mich. 2007) (dismissing false light claim "for same reasons that invalidate[d] [plaintiff's] defamation claim – namely that the defendants' story is not false…."); *Jones v. Jennings*, 2016 WL 4577352, at *5 (Mich. App. Aug. 30, 2016) (same). Moreover, because the statements are not materially false, WXYZ could not have made them with actual malice,[17] and the lack of such actual malice further bars Jones' false light claim based upon these statements. *See Battaglieri v. Mackinac Ctr. For Pub. Policy,* 680 N.W.2d 915, 920-21 (Mich. App. 2004) (holding that false light claims are subject to the same First Amendment limitations as defamation claims and dismissing false light claim against public figure for lack of actual malice); *Armstrong*, 596 Fed. App'x at 444 n.3 ("The requirement that a plaintiff demonstrate actual malice when he is a public figure also applies in the context of false light….").

---

[17] Actual malice exists only where a defendants acts with knowledge, or reckless disregard, of *falsity*. *See*, *e.g.*, *Sullivan*, 376 U.S. at 280 (actual malice requires "knowledge that [a statement] was *false*" or "reckless disregard of whether it was *false* or not") (emphasis added).

35

However, the Court will allow Jones to proceed with his false light claim with respect to the alleged false depiction of Gordon's statement.  The Court held that Jones stated a viable defamation claim with respect to that depiction.  WXYZ offers no argument as to why the Court should dismiss a false light claim that rests upon a depiction that is sufficient to support a defamation claim.  The Court will therefore permit Jones to proceed with a false light claim with respect to the depiction of the Gordon statement.

## G

Finally, in Count IV of the First Amended Complaint, Jones brings a claim for the intentional infliction of emotional distress.  "Under Michigan law, the elements of a claim of intentional infliction of emotional distress are (1) extreme or outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Webster v. United Auto Workers, Local 51*, 394 F.3d 436, 442 (6th Cir. 2005). "In ruling on such a claim, it is initially for the trial court to determine whether the defendant's conduct reasonably may be regarded as so extreme and outrageous as to permit recovery." *Id.* (internal punctuation omitted).

In *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905 (Mich. 1985), the Michigan Supreme Court explained that:

> The cases thus far decided have found liability [for the intentional infliction of emotional distress] only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an

36

> intent which is tortious or even criminal, or that he has
> intended to inflict emotional distress, or even that his
> conduct has been characterized by 'malice', or a degree of
> aggravation which would entitle the plaintiff to punitive
> damages for another tort. Liability has been found only
> where the conduct has been so outrageous in character,
> and so extreme in degree, as to go beyond all possible
> bounds of decency, and to be regarded as atrocious, and
> utterly intolerable in a civilized community. Generally, the
> case is one in which the recitation of the facts to an average
> member of the community would arouse his resentment
> against the actor, and lead him to exclaim, 'Outrageous!'

*Id.* at 909; *see also Webster*, 394 F.3d at 442 ("Extreme or outrageous conduct is

that which goes beyond the bounds of decency and would be considered atrocious

and utterly intolerable in civilized society").

Jones has not satisfied this exacting standard.  WXYZ's alleged actions with

respect to the reports were not "so outrageous in character" as to subject it to liability

for Jones' alleged emotional distress.  WXYZ asked a number of entirely appropriate

questions on a topic of legitimate public concern and then allegedly stepped over the

line and made certain allegedly-defamatory statements about Jones.  While one of

those statements may be actionable through a defamation claim or other tort claims,

the statements are not so outrageous as to give rise to an intentional infliction of

emotional distress claim.  Indeed, Jones has not identified a single case in which a

Michigan court or any court applying Michigan law has sustained an emotional

distress claim under circumstances like these.[18]  The Court therefore will dismiss Jones' claim for the intentional infliction of emotional distress.

## H

WXYZ has moved to dismiss the defamation, tortious interference, and false light claims brought by MVP on a single ground: "the broadcasts say nothing even arguably defamatory about [MVP]." (First Dismissal Motion at 1, ECF #8 at Pg. ID 77.)  MVP counters that the broadcasts defame it through three defamatory statements: (1) that MVP "is owned and operated by persons who have broken the law, who should be referred to the [Attorney General] and who illegally and unethically manipulated a severance payment among the owners of MVP from the Detroit PLA"; (2) that MVP "was formed through an illegal and unethical severance payment engineered by Odis Jones to his business partner Adam Troy"; and (3) that MVP "came into existence as a result of the purported 'secret severances'" in which its "founding partners" participated. (Def.s' Resp. to Renewed Mot. to Dismiss at ii-iii, ECF #25 at Pg. ID 445-46.)

---

[18] In support of his emotional distress claim, Jones relies upon a single case: *Graham v. Ford*, 604 N.W.2d 713 (Mich. App. 1999).  But *Graham* merely states the relevant standard for an emotional distress claim.  And the court in *Graham* affirmed the *dismissal* of a claim for intentional infliction of emotional distress because the plaintiffs had failed to "demonstrate extreme and outrageous conduct or a specific intent … to inflict the alleged injury of emotional distress on plaintiffs." *Graham*, 604 N.W.2d at 717. Thus, *Graham* is no help to Jones.

38

At this point, the Court declines to dismiss MVP's claims on the sole basis offered by WXYZ. The Court cannot now conclude that, as WXYZ contends, the broadcasts say nothing even arguably defamatory about MVP. As explained above, Plaintiffs have plausibly alleged that WXYZ's depiction of Gordon as opining that Jones violated the law is both materially false and capable of a defamatory meaning. MVP has plausibly alleged that the reports connect it to this false depiction by, among other things, displaying the MVP logo and website around the same time that the Gordon depiction is shown and by linking MVP (and its formation) to the payment that Gordon labeled as unlawful. There may be reasons why WXYZ's alleged linking of MVP to Gordon's depiction is insufficient to support a defamation claim, but WXYZ has not yet fully developed an argument to that effect.[19] Thus, for now, the Court will permit MVP to proceed with its defamation claim to the extent that the claim rests upon the connection in the reports between MVP and the depiction of Gordon as opining that Jones broke the law.

---

[19] For instance, the above-quoted "statements" on which MVP rests its claims do not appear verbatim in the reports. Rather, MVP's quotations combine two aspects of the reports: (1) the depiction of Gordon as saying that Jones violated the law in connection with the severances and (2) the statements and images in the reports connecting Jones and Troy to MVP and connecting the Troy severance payment to MVP. There may, perhaps, be an argument that MVP may not pursue a defamation claim by "putting the pieces together" in this manner. But WXYZ has not yet developed such an argument. Again, WXYZ's sole attack on MVP's claims is its assertion that the reports say nothing defamatory about MVP. The Court cannot yet reach that conclusion as a matter of law based upon the current state of the briefing and argument with respect to MVP's claims.

39

The Court likewise declines to dismiss MVP's tortious interference and false light claims at this time. WXYZ seeks dismissal of these claims on the same basis that it sought dismissal of MVP's defamation claim: that the reports do not say anything false and defamatory about MVP. But, as explained above, WXYZ has not yet persuaded the Court that the reports do not plausibly allege a false and defamatory statement concerning MVP. Thus, the Court declines to dismiss the tortious interference and false light claims in their entirety at this point. MVP may pursue these claims to the extent that they rest upon the connection in the reports between MVP and the depiction of Gordon as opining that Jones broke the law.

WXYZ may launch any attack it deems fit on MVP's claims at the summary judgment stage of these proceedings. And the Court anticipates that at that stage, the parties will develop in much greater detail their arguments with respect to MVP's claims.

## V

For the reasons stated above, the Renewed Motion to Dismiss (ECF #24) is **GRANTED IN PART AND DENIED IN PART AS FOLLOWS:**

- The motion is **GRANTED** with respect to Jones' and MVP's defamation, tortious interference, and false light claims to the extent that those claims are based on (1) the use of the phrase "secret severances, (2) statements in the reports that Jones' "secrecy" and "silence" was "purchased," and (3) the

statement that Jones alone caused the PLA to "give" pay Troy $58,000 in

severance;

• The Motion is **GRANTED** with respect to Jones' intentional infliction of

emotional distress claim; and

• The Motion is **DENIED** in all other respects.

**IT IS SO ORDERED**.

s/Matthew F. Leitman

MATTHEW F. LEITMAN

Dated:  April 4, 2017            UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 4, 2017, by electronic means and/or ordinary mail.

s/Holly A. Monda

Case Manager

(313) 234-5113