UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ODIS JONES, *et al.*,

        Plaintiffs,                    Case No. 16-cv-12647

v.                                    Hon. Matthew F. Leitman

SCRIPPS MEDIA, INC.

        Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT (ECF #64)

Now more than ever, we depend upon the "free press" to "awaken[] public interest in governmental affairs" and to "expos[e] corruption among public officers and employees." *Estes v. State of Texas*, 381 U.S. 532, 539 (1965). Indeed, "[t]he press plays a unique role as a check on government abuse" and serves "as a watchdog of government activity." *Leathers v. Medlock*, 499 U.S. 439, 447 (1991).

In the Spring of 2016, Defendant Scripps Media, Inc., through its Detroit television station WXYZ, performed this essential "watchdog" function by exposing that the City of Detroit Public Lighting Authority (the "PLA") had made suspicious severance payments to certain departing employees. The payments were made while Plaintiff Odis Jones served as Chief Executive Officer of the PLA. He personally signed some of the agreements authorizing the payments, and he received one of the payments when he left the PLA.

1

The severance payments raised "red flags" for a number of reasons, including that some of them went to employees who had accused Jones of misconduct; that the PLA did not publicly disclose the amount of the payments when they were made; that the PLA required the departing employees, as a condition of receiving the payments, to agree not to disclose the payments; that the departing employees likely did not have a contractual right to any severance payments, much less the large payments that they received; and that PLA officials refused to answer basic questions about why the payments had been made. In a three-part series of broadcasts, WXYZ exposed the severance payments and the apparently-suspicious circumstances surrounding them, and WXYZ suggested that the payments deserved further scrutiny. "[I]nvit[ing] the public to ask" tough questions about the publicly-funded payments, as WXYZ did, is "the paradigm of a properly functioning press." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1096 (4th Cir. 1993).

Sometimes, though, even a properly functioning press makes a mistake. That happened here. One of WXYZ's reports contained one materially inaccurate statement about Jones. In that report, WXYZ played a video clip depicting noted employment lawyer Deborah Gordon as saying that Jones "violated the law" and that the matter should be "referred to the AG [Attorney General]" (the "Gordon Misquote"). In fact, Gordon said only that "if" Jones "violated the law," a referral to the Attorney General should be made. A WXYZ photographer mistakenly

eliminated the word "if" from the video clip of Gordon's statement as he rushed to edit the report for air. The Gordon Misquote created the misleading impression that an authority on employment law had opined that Jones broke the law.

In this action, Jones and MVP Capital Ventures, LLC ("MVP"), an entity owned in part by Jones, bring defamation and other claims against Scripps based upon the Gordon Misquote and additional allegedly-false statements in the reports. The Court previously dismissed the claims to the extent that they rest on any statements in the reports other than the Gordon Misquote.

The Court now **GRANTS** Scripps' motion for summary judgment on the claims to the extent that they arise out of the Gordon Misquote. Jones' claims based upon the Gordon Misquote fail because he is a public figure, and he has not shown that WXYZ acted with actual malice when it aired the misquote. MVP's claims fail because the Gordon Misquote did not concern MVP and did not give rise to any actionable false implications about MVP. Accordingly, Plaintiffs have no viable claims against Scripps.

**I**

**A**

In a previous Opinion and Order, the Court laid out in detail the background facts relevant to this matter, including details about the PLA, employee severances paid by the PLA, MVP, and the WXYZ broadcasts in question. (*See* Op. and Order, ECF #28 at Pg. ID 487-98.) The Court incorporates that earlier recitation here and sets forth below the facts that are central to the issues now before the Court.

In June 2013, Odis Jones became the Chief Executive Officer of the PLA. (*See* Jones Employment Agreement, ECF #64-2.) The PLA was responsible for restoring the public lighting system in the City of Detroit. Adam Troy served alongside Jones as the PLA's Chief Operating Officer from August 2014 until August 2015. (*See* Troy Employment Agreement, ECF #64-4; Troy Severance Agreement, ECF #64-6.)

In November 2015, two PLA employees, Dana Harvey and Sandra Hughes O'Brien, threatened to file whistleblower lawsuits against the PLA based, in part, upon their allegations that Jones had engaged in improper conduct while leading the PLA. (*See* Draft Complaints, ECF ## 64-10, 64-11.) But Harvey and Hughes O'Brien never filed those suits. Instead, they entered into severance agreements with the PLA under which they received substantial severance payments – $123,000 for Hughes O'Brien and $77,000 for Harvey. (*See* Hughes O'Brien Severance

Agreement, ECF #64-12 at Pg. ID 1172; Harvey Severance Agreement, ECF #64-13 at Pg. ID 1178.) The severance agreements contained confidentiality provisions that prohibited Hughes O'Brien and Harvey from disclosing the terms of their agreements and/or information learned during their employment. (*See* ECF #64-12 at Pg. ID 1174; ECF #64-13 at Pg. ID 1180.) Jones signed the agreements on behalf of the PLA. (*See id.*)

Troy also entered into a severance agreement when he left the PLA. (*See* Troy Severance Agreement, ECF #64-6.) Under Troy's agreement, he received a severance payment of $58,000 even though he worked at the PLA for only one year. (*See id.*) Troy's severance agreement also contained a provision that required him to "speak positively about" his experience at the PLA. (*Id.*) Jones signed Troy's severance agreement on behalf of the PLA. (*See id.*) At some point after Troy left the PLA, he and Jones became partners in MVP. (*See* Jones Dep. at 29, ECF #64-3 at Pg. ID 1059 (describing Jones' and Troy's ownership stakes in MVP).)

In February 2016, Jones announced that he was resigning from the PLA to pursue other opportunities. (*See* Jones Resignation Letter, ECF #64-15.) He also entered into a severance agreement with the PLA at that time. (*See* Jones Severance Agreement, ECF #64-17.) Under Jones' agreement, the PLA paid him $250,000, and it did so even though Jones' employment contract did not entitle him to a severance payment upon resignation. (*See id.* at Pg. ID 1195; Jones Employment

Agreement, ECF#64-2 at Pg. ID 1049; Jones Amended Employment Agreement, ECF #64-19.)   Jones' severance agreement also contained a confidentiality provision. (*See* Jones Severance Agreement, ECF #64-17 at Pg. ID 1196.)

At some point in 2016, WXYZ investigative reporter Ronnie Dahl ("Dahl") began researching and preparing a series of reports about the PLA's severance payments to former employees, including Jones and Troy.   Dahl's investigation – which included interviews with Gordon and with a law professor – revealed that there were significant reasons to question the legality and propriety of the severance payments.

Dahl also interviewed Lorna Thomas, M.D., the Chair of the PLA Board. Dahl asked Dr. Thomas a number of questions about the legitimacy of the severance payments. (*See* Broadcasts, ECF #64-33.)   Dr. Thomas declined to discuss the specifics of any of the severance payments or severance agreements because those issues were, in her words, "personnel matter[s]." (*See, e.g.*, April 29, 2016, Broadcast, ECF #64-33 at 8:44; also available online at https://www.youtube.com/watch?v=mXi1Apvx44k.)   When Dahl asked about Hughes O'Brien's and Harvey's severance packages, Dr. Thomas said: "That is again, a personnel matter.  It doesn't matter, pick any name you want. Susie Q.  I'm not going to discuss it with you." (*Id.*)

In April and May of 2016, WXYZ aired Dahl's three-part series concerning the severances. WXYZ called the reports "Secret Severances." The reports aired on April 28, 2016, April 29, 2016, and May 9, 2016. The three reports raised questions about whether the severance payments were appropriate uses of public monies, whether the payments were lawful, and why the payments were not disclosed to the public. Among other things, the reports questioned whether (1) the payments to Hughes O'Brien and Harvey were part of an effort to conceal possible wrongdoing within the PLA on Jones' watch and/or by Jones and (2) Jones and Troy improperly enriched themselves by taking severance payments to which they were not entitled. The reports also explained that MVP was registered with the State of Michigan one day before Jones signed Troy's severance agreement and that Jones and Troy became partners in MVP months after Troy received his severance payment from the PLA. Finally, the April 29, 2016, report included the Gordon Misquote.

**B**

After the "Secret Severances" reports aired, Jones and MVP filed this defamation action against Scripps. In their First Amended Complaint, they identify four classes of allegedly defamatory statements from the reports:

- **The Gordon Misquote.** As noted above, the April 29, 2016, report included the Gordon Misquote. That misquote depicted Gordon as saying: "He violated the law, and other people got caught in the

crossfire. Bring those people back. Get rid of him. Turn it over to the AG, and don't waste any taxpayer money." (*See* First Am. Compl. at ¶¶ 66-78, ECF #20 at Pg. ID 265-68.)[1] The Plaintiffs contend that Gordon never actually said that Jones violated the law, but instead said only that "*if*" he had violated the law, then there should be consequences for those actions. (*See id.* at ¶69, ECF #20 at Pg. ID 265.) The Plaintiffs insist that Dahl and WXYZ "obscure[ed]" the word "if" and "deceptive[ly] edit[ed]" Gordon's statement "to give the impression … that [it was] a flat declaration … without any context or clarification." (*Id*. at ¶¶ 66, 72, ECF #20 at Pg. ID 265-66.) The Plaintiffs say that the "editing" was "undertaken with the malicious intent to create the false impression[]" that Jones was a "lawbreaker." (*Id.* at ¶75, ECF #20 at Pg. ID 267.)

- **"Secret Severances."** As noted above, WXYZ titled the reports "Secret Severances" and used that term during the reports. Plaintiffs say that the reports falsely portrayed Jones as participating in a "shadowy and illegal scheme" to keep "secret" the severance payments that he and the other PLA employees received. (*Id*. at ¶¶ 83-89, ECF #20 at Pg. ID 269-72.) Plaintiffs contend that the severances were not "secret" and that Jones was not involved in any effort to hide anything from the public.

- **"Buying Silence."** As noted above, Jones received a payment under his severance agreement. In the reports, WXYZ highlighted that

---

[1] Jones alleges that the "he" Gordon referred to was Jones himself. (*See* First Am. Compl. at ¶68, ECF #20 at Pg. ID 265.) WXYZ has not contended that the "he" was someone else.

payment and questioned whether the PLA made the payment in exchange for Jones' promise not to publicly disclose certain information related to the PLA. The Plaintiffs allege that the reports made "repeated slanderous assertions that [Jones] is a corrupt man who can be bought." (*Id*. at ¶90, ECF #20 at Pg. ID 272.) Specifically, the Plaintiffs complain that the reports implied that the PLA "purchased" Jones' "silence" and "secrecy" through his severance payment. (*Id.* at ¶¶ 91, 99, ECF #20 at Pg. ID 272-73, 275.) Jones insists that his silence was not "purchased" and that his severance had nothing to do with remaining "quiet."

- **"Jones Paying Off Troy."** As noted above, the PLA paid Troy a $58,000 severance under an agreement that Jones signed on behalf of the PLA. The reports identified the payment and asked the following question concerning Jones' connection to the payment: "Why did Jones give him [Troy] $58,000 severance after less than a year on the job?" (*Id.* at ¶100, ECF #20 at Pg. ID 275.) Jones says that WXYZ knew that (1) the PLA Board was aware of and agreed with the terms of Troy's severance agreement and (2) the PLA, not Jones himself, made the $58,000 payment to Troy. (*See id.* at ¶¶ 105-106, ECF #20 at Pg. ID 276.) Jones maintains that the question was phrased "in [an] inflammatory fashion to create the false implication that Jones [was] by himself secretly using PLA funds to pay off his business partner." (*Id.* at ¶102, ECF #20 at Pg. ID 276-77.)

The Plaintiffs also complain that the reports showed images of MVP's logo and website while and/or shortly after the Gordon Misquote. (*See*, *e.g.*, *id.* at ¶67,

ECF #20 at Pg. ID 265.)  The Plaintiffs insist that this editing "falsely associate[d]" MVP with the "incendiary statement[s]" about Jones and Troy and falsely implied that MVP "is run by persons who have violated the law." (*Id.* at ¶¶ 67, 76, ECF #20 at Pg. ID 265, 267.)

The First Amended Complaint contains four counts against WXYZ, each brought under Michigan law:

- Defamation (both Plaintiffs) (*see id.* at ¶¶ 120-135, ECF #20 at Pg. ID 281-87);

- Interference with Advantageous Business Relations (both Plaintiffs) (*see id.* at ¶¶ 136-142, ECF #20 at Pg. ID 287-88);

- False Light Publicity Invasion of Privacy (both Plaintiffs) (*see id.* at ¶¶ 143-148, ECF #20 at Pg. ID 288-89); and

- Intentional Infliction of Emotional Distress (Jones only) (*see id.* at ¶¶ 149-154, ECF #20 at Pg. ID 289-90.)

## C

On January 10, 2017, WXYZ filed a motion to dismiss all four counts of the First Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (*See* ECF #24.)

On April 4, 2017, this Court issued an Opinion and Order granting in part and denying in part WXYZ's motion to dismiss. (*See* Op. and Order, ECF #28.)  The Court dismissed Jones' intentional infliction of emotional distress claim because

Jones failed to plead that WXYZ had engaged in outrageous conduct. (*See id.* at Pg. ID 522.) The Court also dismissed Plaintiffs' defamation, false light, and tortious interference claims to the extent that they were based upon the "Secret Severance," "Buying Silence," and "Jones Paying Off Troy" statements described above. (*See id.* at Pg. ID 507-09.) The Court held that Plaintiffs could not proceed with their claims based upon those statements because the Plaintiffs' allegations did not demonstrate that the statements were materially false. (*See id.*)

The Court left intact Plaintiffs' defamation, false light, and tortious interference claims *only* to the extent that they were based on the Gordon Misquote. The Court held that Plaintiffs had sufficiently alleged the falsity of that statement by pleading that (1) Gordon qualified her statement concerning lawbreaking with the word "if" and (2) WXYZ eliminated that word so as to falsely portray that Gordon had, in fact, opined that Jones broke the law. (*See id.* at Pg. ID 513-16.) The Court also held that Jones was a public figure and that he had sufficiently alleged that WXYZ acted with actual malice in airing the Gordon Misquote. (*See id.* at Pg. ID 516-18.)

## D

Following this Court's ruling on the motion to dismiss, the parties conducted discovery, and that discovery revealed how WXYZ came to air the Gordon Misquote.

As noted above, while investigating the severance payments, Dahl interviewed Gordon, a distinguished employment lawyer. During that interview, Dahl asked Gordon to opine on the legality and propriety of the severance payments. In response, Gordon was careful not to directly accuse Jones of breaking the law. As Gordon later explained, she "didn't have any proof [that Jones violated the law] at the time," so she did not "say he broke the law." (Gordon Dep. at 32, ECF #68-11 at Pg. ID 1631.) Instead, Gordon said: "*If* he violated the law, and other people got caught in the crossfire. Bring those people back. Get rid of him. Turn it over to the AG, and don't waste any taxpayer money." (Raw Footage, ECF #64-32 (emphasis added).) While Gordon did not say that Jones violated the law, she did express serious concerns about the severance payments. For instance, she said: "It's bad. It's really bad. Because not only are they wasting taxpayer money, but the other thing they're doing is covering up possible illegal action by a public employee." (*See* Raw Footage, ECF #64-31.)

After Dahl completed the Gordon interview, she added several of Gordon's statements – including the "if he violated the law" statement and the "it's bad" statement – to her interview log. Dahl used that log to keep track of key statements made during recorded interviews. The log identified the speakers, set forth the statements verbatim, and listed the time-stamp identifying the spot on the video at

which the statements appeared. (*See* Log, ECF #64-30.) Dahl accurately reproduced Gordon's "if he violated the law" statement verbatim – including the word "if" – on her interview log. (*See id.*)

**2**

WXYZ aired the first "Secret Severances" report on April 28, 2016. That report was what is known within WXYZ as a "special project." (*See* Dep. of Dave Manney, former WXYZ Producer, at 77, ECF #64-25 at Pg. ID 1243.) Special projects involve extended research and preparation, and WXYZ promotes them in advance of their airing. (*See* Dep. of WXYZ editor Randy Lundquist at 10, 58, ECF #64-27 at Pg. ID 1249-50.) WXYZ editor Randy Lundquist edits most of the station's special projects reports. (*See id.* at 58, ECF #64-27 at Pg. ID 1250.) He edited the April 28, 2016, "Secret Severances" report. (*See id.*)

WXYZ aired the second "Secret Severances" report during its 6:00 p.m. broadcast on April 29, 2016. Unlike the first report, the second report included "day of" material – video that is recorded and prepared for broadcast the same day that it is recorded. (*See* Dep. of Derrick Lee, former WXYZ photographer, at 20, ECF #64-28 at Pg. ID 1254; Dahl Dep. at 74, ECF #68-2 at Pg. ID 1359.) The "day of" material in the second report was a pre-taped interview with City of Detroit Mayor Michael Duggan. (*See* Dahl Dep. at 79, ECF #64-20 at Pg. ID 1216.) Because the second report included the "day of" material, it was not produced and edited in the

same manner as the first report. Dahl wrote the script for the second report shortly before it aired, and photographer Derrick Lee, not special projects editor, Randy Lundquist, made the final edits for the report. (*See* Lee Dep. at 50, ECF #64-28 at Pg. ID 1256.)

Dahl completed the script for the second report and emailed it to Lee for final editing at 5:25 p.m. (*See* Email, ECF #64-29.) Notably, Dahl did *not* include Gordon's "if he violated the law" statement in her script. (*See* Email, ECF #64-29; Lee Dep. at 65-66, ECF #64-28 at Pg. ID 1260.) Instead, Dahl used Gordon's "it's bad" statement. (*See* Email, ECF #64-29.)

After receiving Dahl's draft script, Lee attempted "to edit the video to fit the script." (Lee Dep. at 24, ECF #64-28 at Pg. ID 1255.) But he ran into a problem. The video footage accompanying Gordon's "it's bad" statement showed the back of Gordon's head, and Lee "didn't like" that shot angle. (*Id.* at 90-91, ECF #64-28 at Pg. ID 1266.) Lee "didn't want [his] video to be on air with the back of a head and shaking." (*Id.*) Lee then consulted with Dahl about replacing the "it's bad" quote with a different quote from Gordon that Dahl had "time code[d]" on her interview log. (*Id.* at 71, 91, ECF #64-28 at Pg. ID 1261, 1266.)

After reviewing five possible replacement quotes from Gordon on Dahl's interview log, Lee decided to replace Gordon's "it's bad" quote with another one of Gordon's statements that was filmed from a better angle. (*See id.* at 89, 91-92, ECF

#64-28 at Pg. ID 1266.) He settled on Gordon's "if he violated the law" statement because the video footage containing that statement – which showed the side of Gordon's head rather than the back of her head – "looked good, and [Lee is] all about esthetics [sic]." (*Id.* at 84, 90, ECF #64-28 at Pg. ID 1264, 1266.) When Lee told Dahl that he was going to replace Gordon's "it's bad" quote, Dahl responded, "sounds good." (*Id.* at 71, ECF #64-28 at Pg. ID 1261.) While Lee discussed the footage change with Dahl, he made the decision to switch the clips on his own authority. (*See id.*)

Lee made the final edits to the April 29, 2016, report under "deadline pressure." (*Id.* at 88, ECF #64-28 at Pg. ID 1265.) He had to "put together [the] story pretty quickly" because he received the draft script at 5:25 p.m., and the report was scheduled to air on the 6:00 p.m. broadcast. (*Id.* at 88-89, ECF #64-28 at Pg. ID 1265-66.) Lee made his "best" effort to accurately insert Gordon's "if he violated the law" quote into the report. (*Id.* at 88, ECF #64-28 at Pg. ID 1265.) And he believed that he succeeded. To this day, Lee believes that the word "if" *is* audible in the Gordon statement as aired in the April 29, 2016, report and that the report does not accuse Jones of violating the law. (*Id.* at 72-73, ECF #64-28 at Pg. ID 1261-62.)

Despite Lee's "best" efforts, he did not accurately capture Gordon's entire "if he violated the law" quote in the report. Lee's editing obscured the word "if" in

Gordon's statement, resulting in the Gordon Misquote.[2] (*See* April 29, 2016, Broadcast, ECF #64-33 at 8:53; also available at https://www.youtube.com/watch?v= mXi1Apvx44k). In the story as broadcast, Gordon appears to say of Jones: "He violated the law, and other people got caught in the crossfire. Bring those people back. Get rid of him. Turn it over to the AG, and don't waste any taxpayer money." (*Id.*)

During his deposition, Lee explained that when he made the edits, he was *not* "try[ing] to make false accusations. That [was] not my purpose." (Lee Dep. at 88, ECF #64-28 at Pg. ID 1265.) Indeed, Lee did not see his job as influencing the content of the story. As he put it, "I just shoot and edit, Man." (*Id.* at 72, ECF #64-28 at Pg. ID 1261.) Moreover, Lee did not know who Odis Jones was, did not know whether Jones had broken the law, and had never been told that Jones had broken the law. (*See id.* at 72-73, 93, ECF #64-28 at Pg. ID 1261-62, 1267.)

## E

On May 16, 2018, WXYZ filed a motion for summary judgment on Plaintiffs' remaining claims – which, based upon the Court's earlier ruling, all arise out of WXYZ's use of the Gordon Misquote. (*See* Defs.' Mot. for Summ. J., ECF #64.)

---

[2] At various points in these proceedings, Scripps has contended that the word "if" is audible in the April 29, 2016, report and that there simply is no misquote of Gordon. At best, however, reasonable listeners could differ about whether the word "if" is audible. For purposes of the pending summary judgment motion, the Court draws the inference in favor of Jones, as it must, that the word "if" is not audible.

The Court held a hearing on the motion for summary judgment on September 19, 2018. (*See* ECF #72.) At the conclusion of the hearing, the Court asked the parties to file supplemental briefs that focused on the viability of MVP's claims. The parties filed their supplemental briefs on October 17, 2018 (*see* Pls.' Suppl. Br. at ECF #74 and Defs.' Suppl. Br. at ECF #73), and their replies on November 7, 2018 (*see* Pls.' Reply Br. at ECF #76 and Defs.' Reply Br. at ECF #75).

## II

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact . . . ." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252. Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-252. Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Id.* at 255.

# III

## A

The Court first addresses Jones' claim that WXYZ defamed him by airing the Gordon Misquote.

### 1

Under Michigan law, a plaintiff must prove the following elements to prevail on a claim for defamation:

> 1) a false and defamatory statement concerning the plaintiff, 2) an unprivileged communication to a third party, 3) fault amounting to at least negligence on the part of the publisher, and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication.

*Nichols v. Moore*, 477 F.3d 396, 399 (6th Cir. 2007) (quoting *Rouch v. Enquirer & News*, 487 N.W.2d 205, 211 (Mich. 1992)). A statement "is defamatory under Michigan law 'if it tends so to harm the reputation of another as to lower him in the estimation of the community or deter third persons from associating or dealing with him.'" *Falls v. Sporting News Pub. Co.*, 834 F.2d 611, 615 (6th Cir. 1987) (quoting *Nuyen v. Slater*, 127 N.W.2d 369, 374 (Mich. 1964)). Michigan law imposes liability only for statements that are materially false. *See Rouch*, 487 N.W.2d at 208, 214-15. The test for materiality "look[s] to the sting of the [statement] to determine its effect on the reader; if the literal truth produced the same effect, minor differences [are] deemed immaterial." *Id.* at 214-15.

In addition to satisfying the common-law requirements of defamation under Michigan law, a defamation plaintiff "must also satisfy the constitutional requirements of the First Amendment." *Nichols*, 477 F.3d at 399.  Under the First Amendment, "a statement on matters of public concern must be provable as false before there can be liability under state defamation law." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990).  Moreover, "if the plaintiff is a public figure, he must show by clear and convincing evidence that the defamatory statements were made with 'actual malice.'" *Nichols,* 477 F.3d at 399 (quoting *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964)).  A speaker/publisher acts with "actual malice" when it makes or publishes a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 280 (1964). "Reckless disregard," in this context, "cannot be fully encompassed in one infallible definition." 390 U.S. 727, 730 (1968) (internal quotations omitted).  But at a minimum, "reckless disregard" may be found only where there is "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* at 731.  To publish "with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *Id.*

## 2

WXYZ is entitled to summary judgment on Jones' defamation claim because Jones – whom the Court has already determined to be a public figure – has failed to

establish by clear and convincing evidence that WXYZ acted with actual malice when it aired the Gordon Misquote. As described in detail above, the Gordon Misquote was the result of an accidental editing error that photographer Derrick Lee made under time pressure as he was trying to improve the aesthetics of the report. There is no evidence that Lee was attempting to manipulate the content of Gordon's statement nor that Lee even understood that his edit resulted in the Gordon Misquote. On the contrary, in undisputed testimony, Lee explained that he made his best effort to accurately capture Gordon's statement, that he thought he had successfully done so, and that he saw his sole role as to "shoot and edit," not to influence the content of the report. (Lee Dep. 72-73, 88, 93, ECF 64-28 at Pg. ID 1261-65.) At most, the evidence in this record establishes that Lee acted negligently when he edited Gordon's statement to obscure the word "if." But "mere negligence does not suffice" to show actual malice. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991).[3]

---

[3] In Plaintiffs' response to Scripps' motion for summary judgment, they submitted an affidavit from J. Stott Matthews, the "Managing Partner of Spectrum Computer Forensics and Risk Management, LLC, a firm specializing in computer forensics, electronic discovery, and computer security." (Matthews Aff. at ¶2, ECF #68-21 at Pg. ID 1668.) Matthews opines that Lee "could have made the entirety of the word 'if' audible by simply cutting the video at an earlier point, by adding five to ten frames." (*Id.* at ¶9, ECF #68-21 at Pg. ID 1669-70.) Plaintiffs cite Matthews' affidavit as evidence that, at a minimum, Lee acted recklessly when he made the edit that resulted in the Gordon Misquote. (*See* Pls.' Opp'n to Summ. J., ECF #68 at Pg. ID 1338-39.) The Court declines to consider the affidavit for two reasons. First, in the affidavit, Matthews offers expert analysis concerning video editing, but Plaintiffs

Jones counters that even if Lee did not act with actual malice, Dahl did. And Jones insists that Dahl's purported malice is sufficient to sustain his defamation claim based upon the Gordon Misquote. The Court disagrees.

Jones' focus on *Dahl's* alleged actual malice is misplaced because Dahl was not responsible for the Gordon Misquote. As noted above, Dahl did not propose using Gordon's statement that became the Gordon Misquote – her draft script included Gordon's "it's bad" statement, not Gordon's "if he violated the law" statement. And Dahl did not make the final decision to switch to the "if he violated the law" statement. Lee did. Most importantly, *there is no evidence connecting Dahl to Lee's edit that obscured the word "if" and created the Gordon Misquote.* While Lee told Dahl that he was going to switch video clips from the Gordon interview, Dahl had no reason to believe that the switch would result in the Gordon Misquote. Dahl had *accurately* listed Gordon's "if violated the law" quote *in full* on her interview log, and nothing that Lee said or did put Dahl on notice that Lee would materially alter that quote when lifting it from her interview log and inserting it into the April 29, 2016, report. Moreover, there is no evidence that Dahl knew before the April 29, 2016, report aired that Lee had mis-edited the quote. Simply put, Dahl

_____

neither disclosed him as an expert as required by Rule 26(a)(2)(A) of the Federal Rules of Civil Procedure nor served an expert report concerning his opinions as required by Rule 26(a)(2)(B). Second, the affidavit does not contain sufficient information to support a finding that Matthews, who heads a computer forensics firm, is qualified to offer an expert opinion concerning video editing.

did not cause, contribute to, know about, or have reason to anticipate or suspect the Gordon Misquote in advance. Therefore, Jones may not rely upon Dahl's alleged state of mind in order to establish that WXYZ acted with actual malice when it aired the Gordon Misquote.[4]

Jones also argues that WXYZ acted with actual malice by "purposeful[ly] avoid[ing] the truth." (Pls.' Opp'n to Summ. J., ECF #68 at Pg. ID 1339-40 (citing *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657 (1989)).) Jones contends that the "truth" was set forth in an investigative report by PLA General Counsel Tiffany Sadek (the "Sadek Report"). (*See id.*; Sadek Report at ECF #64-9.) In the Sadek Report, Sadek (1) reviewed the allegations of lawbreaking made by whistleblowers Hughes O'Brien and Harvey and (2) concluded that Jones did not violate the law as they alleged. (*See* Sadek Report, ECF #64-9.) Jones argues that WXYZ "continuously ignored" the Sadek Report and "derided [it] as the work of a compromised insider," and he contends that WXYZ's treatment of the report shows

---

[4] In any event, Jones has failed to show by clear and convincing evidence that Dahl acted with actual malice. He highlights that Dahl allegedly harbored ill-will and personal animus towards him. (*See* Pls.' Opp'n to Summ. J., ECF #68 at Pg. ID 1341.) But "[a]ctual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991). And while it "cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry," *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989), Jones has not made a persuasive showing that Dahl's alleged negative feelings for him led her to recklessly disregard the alleged falsity of anything in WXYZ's reports.

that it did not care about the truth. (Pls.' Opp'n to Summ. J., ECF #68 at Pg. ID 1340.)

The avoidance-of-the-Sadek-Report theory of actual malice cannot save Jones' defamation claim for two reasons. First, there is a disconnect between this theory and the undisputed evidence as to how the Gordon Misquote ended up in the April 29 report. As described above, the evidence shows that a last-minute editing error by Lee caused the Gordon Misquote, and there is no evidence that Dahl (or anyone else at WXYZ) was aware of or contributed to that error. Thus, even if Dahl and others at WXYZ did fail to acknowledge and/or did deride the Sadek Report, as Jones alleges, that conduct played no role in the airing of the Gordon Misquote.

Second (and in any event), WXYZ did not ignore the Sadek Report. Dahl mentioned the report in the May 9, 2016, report and told her viewers that Sadek "dug through it all" and concluded that "Jones did nothing wrong." (*See* May 9, 2016, Broadcast, ECF #64-33 at 13:21; also available at https://www.wxyz.com/news/tonight-at-11-secret-deals-cost-taxpayers-more-than-500k.) WXYZ also posted the Sadek Report on its website. (https://www.wxyz.com/news/tonight-at-11-secret-deals-cost-taxpayers-more-than-500k.) Dahl did raise questions about Sadek's impartiality, but those questions were not unfair given that Sadek had done work for Adam Troy and MVP before she joined the PLA. (*See* Troy Dep. at 97-100, ECF #68-9 at Pg. ID 1621-22.)

Indeed, WXYZ was under no obligation to accept Sadek's findings at face value or to refrain from raising concerns about Sadek's possible bias. That WXYZ presented reasons for discounting the Sadek Report is not evidence of actual malice.

On this record, no reasonable juror could find by clear and convincing evidence that WXYZ acted with actual malice when it aired the Gordon Misquote. WXYZ is therefore entitled to summary judgment on Jones' defamation claim. *See Anderson*, 477 U.S. at 254 (holding that summary judgment should be granted against public figure on defamation claim where the evidence "is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.").

## B

Jones' two additional claims – for tortious interference with adventagous business relations and false light publicity invasion of privacy – fall along with his defamation claim. The tortious interference claim is not viable because "[i]t is well-established in Michigan law that once a defamation claim falls, all related tortious interference claims fall with it." *Hazime v. Fox TV Stations, Inc.*, 2013 WL 4483485, at *14 (E.D. Mich. Aug. 19, 2013) (citing *Lakeshore Cmty. Hosp., Inc. v. Perry*, 538

N.W.2d 24, 27 (Mich. App. 1995)).[5]  Likewise, Jones' false light claim fails as a matter of law because, as described above, Jones failed to present evidence sufficient to support a finding by clear and convincing evidence that WXYZ acted with actual malice. *See Battaglieri v. Mackinac Ctr. For Pub. Policy*, 680 N.W.2d 915, 920-21 (Mich. App. 2004) (holding that a public figure bringing a false light claim under Michigan law must prove by clear and convincing evidence that the defendant acted with actual malice).

## IV

### A

The Court next turns to MVP's defamation claim arising out of the Gordon Misquote.  Plaintiffs insist that this claim is viable because the defamatory sting of the Gordon Misquote "attach[ed]" to MVP. (*See* Pls.' Suppl. Br. at ECF #74 at Pg. ID 1803.)  The Court disagrees.

As explained below, the Gordon Misquote did not concern MVP.  Moreover, the references to MVP that followed the Gordon Misquote, when understood in their proper context, did not connect the misquote to MVP in a manner that defames MVP. For these reasons, MVP's defamation claim arising out of the Gordon Misquote fails

---

[5] See also *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 535 (6th Cir. 2014) (holding that where defamation claim failed due to insufficient evidence of actual malice, court did not need to separately address parallel state-law tortious interference claim because it "fail[ed] along with the defamation claim").

as a matter of law. *See Nichols*, 477 F.3d at 399 (explaining that under Michigan law, an essential element of a defamation claim is "a false and defamatory statement concerning" the plaintiff).

## 1

To begin, it is clear that the Gordon Misquote, standing alone, did not concern MVP. As the *Restatement (Second) of Torts* explains, a statement made about a corporate officer or shareholder "concerns" the relevant corporation only where the statement "also reflect[s] discredit upon the method by which the corporation conducts *its* business." *Restatement (Second) of Torts* § 561 (1997) comment (b) (emphasis added). Indeed, "[a] corporation is not defamed by, and has no cause of action for, communications defamatory of its agents, officers, stockholders, or promoters unless such communications also reflect discredit upon the method by which the corporation conducts *its* business." 50 *Am. Jur. Libel and Slander* § 328 (2018) (emphasis added).[6] Stated another way, "[w]ords spoken or written of a stockholder or office give no right of action to [a] corporation unless spoken or

---

[6] *See also* 53 *C.J.S. Libel and Slander* § 60 (2018) ("An imputation defamatory to its officers or members does not constitute defamation of the corporation itself, at least unless it suffers special damage. However, an accusation of misconduct on the part of corporate officers *when acting as and for the corporation, which discredits the corporation in its trade or business*, is a defamation against the corporation.") (Emphasis added.)

written in *direct relation to the trade or business of the corporation*." *Life Printing & Pub. Co. v. Field*, 64 N.E.2d 383, 384 (Ill. App. 1946) (emphasis added).

Here, the Gordon Misquote did not address the method by which MVP conducted *its* business. The Gordon Misquote focused solely on Jones. And it addressed his alleged misconduct *while employed by the PLA – before* he became a partner in MVP and began running MVP's private development business. Indeed, a key point of the Gordon Misquote was to raise concern about the possible "waste" of "taxpayer money" by a *public* agency. Because the Gordon Misquote did not impugn the manner in which MVP conducted *its* private operations, the misquote did not "concern" or defame MVP. MVP therefore may not pursue a defamation claim based upon the Gordon Misquote.

The court in *Afftrex, Ltd. v. General Electric Co.,* 555 N.Y.S.2d 903 (N.Y. App. Div. 1990), reached the same conclusion under similar circumstances. The corporate plaintiff in that case, Afftrex Limited, brought a defamation claim based upon a "statement made during a management seminar conducted by defendant General Electric Company." *Id.* at 904. In the alleged statement, an employee of General Electric said: "Bill Button, the owner of Afftrex, is also an evil man. Because of his being an evil man, he too was fired from his [previous] job." *Id.* Afftrex Limited alleged that the statement was false – because Button was not, in fact, fired from his prior position for any evil acts or misconduct – and that the false

reference to its owner, Button, defamed the company. The court held that while Button, individually, could pursue a defamation claim based upon this statement, Afftrex Limited could not do so because "the allegedly defamatory words reflect directly on Button and his former employment, not upon Afftrex." *Id.* Therefore, even though the speaker identified Button as the owner of Afftrex, "the statement was insufficiently 'of and concerning' Afftrex to such an extent that it cannot form the basis of an action for defamation [by Afftrex]." *Id.*

Here, like the allegedly defamatory statement in *Afftrex*, the Gordon Misquote casts aspersions on Jones' actions during his *prior* employment, not on the operations of, or his role in directing, his current company (*i.e.*, MVP). Thus, as in *Afftrex*, MVP may not pursue a defamation claim based upon the Gordon Misquote.

Plaintiffs have cited one case in which a court has allowed a corporate entity to assert a defamation claim based on a statement concerning its shareholder, *see Balestriere, PLLC v. CMA Trading, Inc.*, 2014 WL 929813 (S.D.N.Y. Mar. 7, 2014), but that case is distinguishable. The plaintiff in *Balestriere, PLLC* was a law firm. It sued certain former clients based upon emails that the clients wrote about John Balestriere, a partner in the firm and its namesake. In the emails, the former clients made allegedly false statements about conduct that Balestriere engaged in while serving as their lawyer. The court held that the law firm could assert a defamation

28

claim based upon these statements *because they concerned Balestriere's work on behalf of the firm,* which shared his name:

> The e-mail in this case asserted that John Balestriere had engaged in certain misconduct, but the reference implicitly was to actions that he had taken in carrying out the business of his law firm, Balestriere PLLC. Although the e-mail did not so state on its face, the pertinent inquiry is whether the libel designates the plaintiff in such a way as to let those who knew him understand that he was the person meant. Given the link of the names Balestriere and Balestriere PLLC and the fact that *Mr. Balestriere was carrying out the business of the firm in engaging with Eben*, a person who knew of these circumstances could reasonably infer that the statement reflected not only on Mr. Balestriere himself but *also on the firm, which he was representing in his dealings with Eben and CMA.*

*Balestriere PLLC,* 2014 WL 929813, at *18 (emphasis added).

Unlike the allegedly-defamatory statements in *Balestriere PLLC*, the Gordon Misquote does not pertain to alleged misconduct that (1) was undertaken by Jones on behalf of MVP or (2) could be attributed to MVP. These contrasts with the defamatory statement in *Balestriere, PLLC*, underscore that the Gordon Misquote did not concern MVP. For that reason, MVP may not assert a defamation claim based upon the misquote, standing alone.[7]

---

[7] Plaintiffs cite several other cases in support of their contention that MVP may assert a defamation claim arising out of the Gordon Misquote, but none of those cases involve a corporate entity asserting a defamation claim based upon a statement concerning its shareholder. Moreover, those cases are distinguishable on other grounds and/or are not persuasive on the precise issue presented here. In several of the cases, the courts allowed plaintiffs to assert defamation claims based upon

Plaintiffs argue that MVP may assert a defamation claim arising out of the Gordon Misquote even though, standing alone, it did not concern MVP. They insist that WXYZ defamed MVP by following the Gordon Misquote with an "immediate reference" to Troy's severance payment and to the formation of MVP. (*See* Pls.'

---

allegations of misconduct against entities that shared essentially the same name as the plaintiffs *and* conducted the *same business* as the plaintiffs. *See, e.g., Golden Bear Distributing Sys. Of Texas, Inc. v. Chase Revel, Inc.*, 708 F.2d 944, 948-49 (5th Cir. 1983) (holding that where two corporations with the "same name" were mentioned in an article that linked their marketing practices and then described fraud committed by one of the corporations, the second corporation could bring a defamation claim because a reasonable reader could infer that the article was accusing that corporation of fraud); *Patzer v. Liberty Communications, Inc.*, 650 P.2d 141 (Or. App. 1982) (holding that an individual who was the sole owner of a construction company that bore his name could bring a defamation claim based upon a statement concerning the company's work "because [since] plaintiff's surname is part of the corporation name, it is possible that persons hearing the remarks would understand them to refer to plaintiff.") These cases do not apply here because Jones and MVP do not share the same name, and, more importantly, because the Gordon Misquote related to Jones' alleged misconduct while acting for a *different* entity than MVP in an entirely different line of work. The decision in *Caudle v. Thomason*, 942 F.Supp. 635 (D.D.C. 1996), is also inapposite. The plaintiff in that case was the president and chief executive officer of a small company. He asserted a defamation claim based upon statements alleging poor performance by the company while under his direction. The court denied a motion to dismiss the claim. It held the plaintiff could assert a defamation claim based upon the statements because he alleged that he, personally, "made all business decisions which are the subject matter of" the statements. *Id*. at 638. The court held that in light of that allegation, a reader could infer that the plaintiff, personally, "was responsible for or involved with the [company's] alleged wrongdoings." *Id*. Here, unlike in *Caudle*, there is no overlap between the Gordon Misquote that Jones violated the law while running the PLA, on one hand, and the operations of MVP, on the other hand.

Suppl. Br. at ECF #74 at Pg. ID 1803.)  The "reference" to the Troy payment and to

MVP's formation that followed the Gordon Misquote is as follows:

> **Dahl**: "More mystery surrounds the $58,000 handed to Chief Operating Officer Adam Troy. He got the money after less than a year on the job. It was signed by his boss, Odis Jones, and months later the two became partners in a company called MVP Capital.
>
> [Showed screenshot of MVP logo]
>
> **Dahl:** Curiously, the company was registered with the state one day before Jones signed Troy's severance deal."

(April 29, 2016, Broadcast, ECF #64-33 at 9:01; also available at

https://www.youtube.com/watch?v=mXi1Apvx44k.)   Plaintiffs insist that when

WYXZ placed these statements after the Gordon Misquote, WXYZ falsely implied

that (1) Gordon deemed the payment to Troy unlawful and (2) MVP "benefitted

from," and was founded in connection with, the payment that Gordon found

unlawful. (*See* Pls.' Suppl. Br. at ECF #74 at Pg. ID 1803, 1805.)  The Court

disagrees.  Neither of these implications reasonably arises from a full and fair

viewing of the report.

The segments of the report that immediately preceded the Gordon Misquote

made clear that Gordon was addressing the severance payments to Hughes O'Brien

and Harvey, not the payment to Troy or the formation of the MVP.  Those preceding

segments provided as follows:

[Cut to interview with Mayor Duggan]

**Dahl**: Well what's the purpose of the confidentiality agreements? Is this shut up money?

**Mayor Duggan**: You'll have to talk to them about that. So that's between the Board and the staff.

[Cut to interview with Gordon]

**Dahl**: But noted employment lawyer Deb Gordon, who reviewed the documents for Action News, has a theory.

**Gordon**: It's an exchange for giving up your rights to file a lawsuit and to ask you – insist that you remain quiet.

**Dahl**: And indeed, documents obtained by the investigators reveal Hughes O'Brien and Harvey threatened whistleblower lawsuits, claiming they witnessed illegal activities at the PLA. The suits were drafted but never filed.

[Cut to interview with Dr. Thomas]

**Dahl**: Were you aware that Dana Harvey and Sandra Hughes O'Brien were threatening to file a lawsuit against the PLA, and following that threat, they then walked away with some pretty hefty severance packages. Were they paid to keep their mouths shut?

**Dr. Thomas**: That is again, a personnel matter. It doesn't matter, pick any name you want. Susie Q. I'm not going to discuss it with you.

(April 29, 2016, Broadcast, ECF #64-33 at 7:58; also available at https://www.youtube.com/watch?v=mXi1Apvx44k.) After these segments, WXYZ cut immediately to the Gordon Misquote in which, again, she says: "[Jones] violated

the law, and *other people got caught in the crossfire*. Bring *those people* back. Get rid of him. Turn it over to the AG, and don't waste any taxpayer money." (*See id.* at 8:53; emphasis added.)

In this context, the Gordon Misquote cannot reasonably be understood as referring to the payment to Troy or the founding of MVP. Hughes O'Brien and Harvey – as the whistleblowers who reported Jones and then left the PLA – are the only individuals to whom Gordon could be referring when she suggests that certain former employees got "caught in the crossfire" of Jones' alleged lawbreaking and should be brought "back." Indeed, it would be unreasonable to conclude that Gordon was referring to Troy – identified in the report as Jones' ally and business partner – as someone who got caught in the "crossfire" of Jones' alleged lawbreaking and who should be brought "back." In short, given the set-up of the Gordon Misquote, it is clear that the misquote has nothing to do with Troy's departure from the PLA and/or the formation of MVP.

And WXYZ did not connect the Gordon Misquote to those issues by "immediately follow[ing]" the misquote with a reference to them. Rather, WXYZ drew a clear distinction between the potential lawbreaking addressed in the Gordon Misquote, on one hand, and the severance payment to Troy and formation of MVP, on the other hand. Immediately after the Gordon Misquote, Dahl said: "*More mystery surrounds the $58,000 handed to [PLA] Chief Operating Officer Adam*

Troy." (*See id.* at 9:01; emphasis added.) "More mystery" connotes "mystery" *above, beyond, and apart from* the wrongdoing addressed in the preceding Gordon Misquote. Thus, even though WXYZ followed the Gordon Misquote with references to Troy's severance payment and the founding of MVP, WXYZ presented the payment and founding as matters *separate* from the illegalities addressed by Gordon. Since WXYZ did not imply that Gordon deemed the payment to Troy unlawful or the founding of MVP tainted in any way, MVP may not pursue a claim of defamation based upon such implications. MVP has no viable claim for defamation.

## B

MVP likewise does not have a viable claim for tortious interference with advantageous business relations arising out of the Gordon Misquote. That claim fails as a matter of law because the defamation claim based upon the misquote fails. *See, e.g.*, *Hazime*, 2013 WL 4483485, at *14 ("It is well-established in Michigan law that once a defamation claim falls, all related tortious interference claims fall with it") (citing *Lakeshore Cmty. Hosp*, 538 N.W.2d at 27)).

## C

Finally, Scripps is entitled to summary judgment on MVP's false light claim based upon the Gordon Misquote. In order to prevail on that claim, MVP must prove that, among other things, WXYZ acted with "knowledge of" or "in reckless

disregard as to the falsity of the publicized matter." *Early Detection Ctr., P.C. v. New York Life Ins. Co.*, 403 N.W.2d 830, 835 (Mich. Ct. App. 1987) (citing *Sawabini v. Desenberg*, 372 N.W.2d 559 (Mich. Ct. App. 1985)); *Dadd v. Mount Hope Church*, 780 N.W.2d 763, 763 (Mich. 2010) (approving false light jury instruction that "plaintiff must prove by a preponderance of the evidence that the defendant must have known or acted in reckless disregard of the falsity of the information and the false light in which the plaintiff would be perceived."). For the reasons explained above in Section III(A)(2), MVP has not presented sufficient evidence to support a finding – under any standard – that WXYZ aired the Gordon Misquote with knowledge or reckless disregard of its falsity.[8] Thus, Scripps is entitled to summary judgment on MVP's false light claim.

---

[8] In Section III(A)(2), the Court addressed whether Jones had shown that WXYZ acted with actual malice. The analysis in that section applies here because in relevant part the test for false light liability parallels the "actual malice" standard applied by the Supreme Court in defamation actions. *See Sullivan*, 376 U.S. at 280 (1964) (defining "actual malice" as making or publishing a statement "with knowledge that it was false or with reckless disregard of whether it was false or not"). Moreover, while the Court was applying the clear and convincing evidence standard in Section III(A)(2), the Court's analysis in that section reveals that that there is a complete lack of evidence that WXYZ aired the Gordon Misquote with knowledge or reckless disregard of its falsity. Thus, even though MVP's burden – as a private actor – is to prove WXYZ's state of mind by a preponderance of the evidence, it cannot clear that hurdle.

## V

**IT IS HEREBY ORDERED** that WXYZ's motion for summary judgment (ECF #64) is **GRANTED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: January 18, 2019

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 18, 2019, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764